Pedro **CASTRO** et al.

v.

Nancy **BEECHER** et al.

Civ. A. No. 70–1220–W.

United States District Court,
D. Massachusetts.

Nov. 17, 1971.

Supplemental Memorandum Nov. 19, 1971.

Memorandum and Order Dec. 3, 1971.

As Amended Dec. 6, 1971.

Thomas A. Mela, Boston, Mass., Massachusetts Law Reform Institute, Patrick J. King, Boston, Mass., Boston Legal Assistance Project, and Jeffry A. Mintz, New York City, for plaintiffs.

Walter H. Mayo, III, and John F. McGarry, Asst. Attys. Gen., for defendants Civil Service Comm. and Director of Civil Service Comm.

Robert Glass, Cambridge, Mass., for defendant Edmund McNamara, Commissioner of Police of the City of Boston.

Joel Selig, and Herman G. Thompson, U. S. Dept. of Justice, for the United States, amicus curiae.

John F. Dargin, Jr., Boston, Mass., for the Veterans of Foreign Wars of the United States, Inc., Dept. of Massachusetts, amicus curiae.

John F. Dargin, Jr., Robert Hagopian, Cambridge, Mass., and John P. Swift, Boston, Mass., for Disabled American Veterans, amicus curiae.

Henry Wise, and Robert L. Wise, Boston, Mass., for the Boston Police Patrolmen's Assn., Inc., amicus curiae.

Roy A. Hammer, and Matthew H. Feinberg, Boston, Mass., for Civil Liberties Union of Mass., amicus curiae.

## OPINION

WYZANSKI, Senior District Judge.

This action involves principally[1] alleged violations of the April 20, 1871 Civil Rights Act, 42 U.S.C. § 1983 and presents claims that state and city officials in recruiting and hiring policemen discriminated against certain minorities.

Six blacks and two Puerto Ricans unsuccessfully sought appointment as Boston policeman. On behalf of themselves and other blacks and a group which, in accordance with terminology of the Bureau of the Census, they denominate[2] "Spanish-surnamed persons" they filed in this court a complaint against the Director of The Massachusetts Civil Service Commission, the members of that Commission, and the Commissioner of Police of Boston. Plaintiffs alleged that defendants in the recruitment and appointment of policemen are engaged in a policy[3] and practice of invidiously discrim-

inating against blacks and Spanish-surnamed persons who have applied, or might have applied, or might hereafter apply to be policemen in Boston and in other Massachusetts cities and towns, and in certain state agencies, the Metropolitan District Commission, the Massachusetts Bay Transportation Authority, and the Bureau of State Buildings, commonly called the Capitol Police.

The claim is that among the practices by which defendants have excluded, limited, and discouraged the employment of black and Spanish-surnamed persons are (a) furnishing on a discriminatory basis information about police employment opportunities, (b) establishing educational requirements not bearing upon any legitimate job qualifications, (c) requiring police applicants to submit to a written examination which has not been validated as predictive of successful job performance in the position of policeman, and (d) requiring police applicants to submit to other miscellaneous job requirements, such as a height test and a swim test.

Both injunctive relief and declaratory judgments are sought on behalf of the eight named plaintiffs and a class composed of all black and Spanish-surnamed persons who have sought, or might have sought, or may hereafter seek employment as policemen in positions covered by Massachusetts civil service laws.

This court's jurisdiction is founded on 28 U.S.C. §§ 1343(3) and (4), 2201 and 2202. Carter v. Gallagher, 8th Cir., 1971, 452 F.2d 315; Dkt No. 71–1181 (Sept. 9, 1971). This court also has pen-

1. Paragraph 11 of the complaint claims "violations of plaintiffs' rights * * * under 42 U.S.C. §§ 1981, 1983; the Thirteenth and Fourteenth Amendments to the United States Constitution; and Mass. Gen.Laws Ch. 31, § 10." The reference to the Thirteenth Amendment is frivolous. The references to 42 U.S.C. §§ 1981 and 1983 and the Fourteenth Amendment are supported by Carter v. Gallagher, 8th Cir., 1971, 452 F.2d 315; Dkt No. 71–1181 (Sept. 9, 1971). The reference to Mass.G.L. c. 31 § 10 is wholly appropriate and will be considered later.

2. "Spanish-surnamed persons" is a term which would apply to a native American with a Spanish surname whose ancestors

had for generations lived in the United States, to a person with a Spanish surname born in Madrid and educated at its famous university, and to many others who obviously are not in the same class as any of the named plaintiffs. What the pleader presumably meant was persons who were born or whose parents were born in Puerto Rico, Cuba, or other Caribbean countries, whose primary language is Spanish, and who have not had education and training comparable to that received by most mainstream white Americans.

3. The complaint seemingly uses "policy" in the sense of "course of action," not in the sense of purpose, motive, or intent.

dent jurisdiction of the claim that the Director of Civil Service violated Mass. G.L. c. 31 § 10. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The complaint does not claim and there is no evidence that defendants ever expressed a discriminatory purpose or used any practice which on its face was invidiously discriminatory.[4]

What is factually in issue is whether defendants' standards and procedures for the recruitment and hiring of policemen are significantly related to a policeman's successful job performance, and, if not, whether, as the complaint alleges, they operate as parts of a policy, that is as elements in a course of conduct, which *objectively* has the consequence of disqualifying black and Spanish-surnamed actual and potential police applicants at a substantially higher rate than the generality of white applicants.

Before considering the practices specifically recited in the complaint, we are asked by plaintiffs to take into account statistics with respect to the percentage of blacks and Puerto Ricans in the police force of Boston and elsewhere in Massachusetts compared with the percentage of the same minorities in the general population. Plaintiffs' contention is that cases such as Carter v. Gallagher, *supra*, Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir., 1970), United States v. Ironworkers Local 86, 443 F.2d 544, 551 (9th Cir., 1971), Arrington v. Mass. Bay Transportation Authority, 306 F.Supp. 1355, 1358 (D. Mass., 1969), and Penn v. Stumpf, 308 F.Supp. 1238, 1242–1243 (N.D.Cal., 1970), indicate that a *prima facie* case of racial discrimination is established and that a shift in the burden of persuasion, although not in the burden of proof, from plaintiffs to defendants is effectuated

when it is shown that a particular employer has a large work force performing a particular type of work in an area in which there are a large number of persons belonging to a particular ethnic or other minority group and that the percentage of that group employed by that employer at that work is substantially lower than the percentage of that group in the population of that area.

In the case at bar there is enough evidence with respect to black persons in the Boston population and in the Boston police force for us to address ourselves to the soundness of plaintiffs' legal proposition as to a *prima facie* case with respect to the Boston police situation and a shift in the burden of proof with respect to the alleged discrimination against black applicants to be Boston policemen. At this point we momentarily leave aside Spanish-surnamed persons and situations outside of Boston, since the immediate question is whether plaintiffs' proposition applies to any part of the case at bar.

At all times in the 1960–1970 decade Boston's total population was over 700,-000, its black population over 60,000, and its police force over 2,000. Thus we are dealing with large enough figures to permit meaningful comparisons.

In the Boston population the blacks were about 9% in 1960 and about 16.3% in 1970; but in the Boston police force the blacks were only about 2% in 1960 and about 3.6% in 1970.

Such a substantial discrepancy obviously invites inquiry, even though some of it is plainly not attributable to the defendants.

Much is due to the discriminatory practices of American society. Cooper and Sobol, Seniority and Testing Under Fair Employment Laws, 82 Harv.L.Rev. 1598 (1969). See Arrington v. Mass. Bay Transportation Auth., 306 F.Supp. 1355,

---

4. All parties recognize and this court holds that to succeed in an action alleging that, in violation of 42 U.S.C. § 1983, defendants by racially discriminatory practices deprived plaintiffs of their Fourteenth Amendment rights to the equal protection of the laws plaintiffs need neither allege nor prove that defendants acted with intent or motive to discriminate. Carter v. Gallagher, *supra*, Cf. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). See Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

**936**

1358 (D.Mass., 1969). Our civilization as a whole has by laws, customs, institutions and personal prejudices discriminated in the opportunities for education and training it has made available to blacks. As a result, blacks as a group are less qualified than whites as a group for any employment except the most menial. This disparity increases with the complexity and technical requirements of the job. Since some aspects of the policeman's job demand special skills reflecting advanced education and training, even under a completely neutral policy of selection, blacks will be, on the average, less likely than whites to be found qualified and to be appointed.

Much of the discrepancy seems due to a differential between blacks and whites in their desires to become policemen. The testimony in this case, official reports,[5] and the reluctance of blacks to respond to defendant Police Commissioner McNamara's recruitment campaign,[6] indicate that blacks are disinclined to become policemen because of hostility to the calling and because, if qualified to be policemen, blacks have more rewarding and otherwise attractive offers for other positions.

But it would be naive to find that the technical skills required of policemen, the discriminatory practices of American society in training and educating blacks, and the reluctance of blacks to become policemen are the sole reasons why when blacks are one-sixth of the Boston population they are only one-thirtieth of the Boston police force. To be sure, equally dramatic differentials exist with respect to the percentage of blacks who are judges, lawyers, doctors, university profes-

sors, engineers, architects, and practitioners of other learned callings. But the policeman's calling, demanding as it is of qualities developed by training and education, is hardly to be described as a learned or professional calling for which very few blacks could qualify even on the basis of an unbiased selection. Indeed it appears from the recent experience of many American cities such as Baltimore, Chicago, and Detroit, that when there are no irrelevant barriers and the public authorities welcome blacks the percentage of police appointees who are black bears a close relation to the percentage of the population who are black.

■ However, statistics comparing blacks in the population and in the police force do not show even *prima facie* whether if there is discrimination it is attributable to the Massachusetts Civil Service Commission, or to the Boston Police Department, or to both. Moreover, those statistics are of no value in deciding which, if any, of the specific practices referred to in the complaint are discriminatory and should be enjoined. We, therefore, turn to a detailed consideration of the challenged practices followed in recruiting police candidates, in establishing educational requirements, in requiring candidates to pass a 100-yard swim test, in setting a 5' 7" height minimum, and in formulating written examinations.

To understand plaintiffs' claims it is appropriate to set out in a general way the statutory scheme established by Mass. G.L. c. 31 for the recruitment and appointment of policemen. Clarity will be promoted if we direct attention and make reference principally to the statutory procedures with respect to the Boston police.

---

5. The Report of the National Advisory Commission on Civil Disorders, p. 316 refers to "the bad image of the police in the Negro community" and to the fact that "better qualified Negroes are often more attracted by other, better paying positions."

6. Even after the Boston Police Department's campaign to get black and Spanish-surnamed persons to become policemen, only 5% of the Boston residents who took the September 26, 1970 police entrance

examination were black or Spanish-surnamed. This low figure may be attributable in part to past discriminatory practices in our society, the failure of blacks to achieve high rank in the Boston police force, distrust of officials now in office, the type of examinations and requirements now used, or policies now pursued; but all this is speculative. What is incontrovertible is that there is not now an eagerness on the part of blacks to make application to be policemen in Boston.

This involves no distortion since those procedures apply *mutatis mutandis* to all other police forces governed by the Massachusetts civil service system.

When the Commissioner of Police of the City of Boston wishes to make appointments to permanent patrolman positions the statute limits him to choosing from certified lists supplied by the Massachusetts Civil Service Commission.

The opening gambit for the Commissioner of Police is to file with the Civil Service Commission a "Massachusetts Civil Service Requisition Blank" reciting the number, proposed salaries, and duties of the patrolmen he proposes to appoint, and requesting the Commissioner to certify a list or lists of eligibles established as a result of open competitive examinations. Next, the Civil Service Commission responds by certifying names in a number determined by a statutory formula to assure the Police Commissioner of a limited choice. The Commissioner gets the names from eligibility lists established within three years before the certificate on the basis of open competitive examinations. The names must be taken from the lists in the chronological order of their establishment.

Each eligibility list is established by the Commission on the basis of the results of written, physical, and medical examinations, "conducted under the direction of the director, who shall determine the form, method and subject matter thereof; provided, that they shall relate to matters which will fairly test the fitness of the applicants actually to perform the duties of the positions for which they apply." Mass.G.L. c. 31 § 10.

Not only is the Director of Civil Service given the duties of conducting examinations, preparing eligibility lists based on examination results and on statutory veterans' preferences, and drawing therefrom names to be certified to the Police Commissioner for the latter's selection for appointment, but the Director is required to establish a recruitment program to fill vacancies in all civil service positions, including the patrolmen's positions in the Boston Police Department. Mass. G.L. c. 31 § 2A(m). No duty of recruitment is imposed upon the Police Commissioner.

In the case at bar, plaintiffs' first specific grievance is that the defendants failed to apprise plaintiffs of employment opportunities while making such information available to white persons.

█ One answer to this grievance is that each of the eight named plaintiffs knew of the police employment opportunities as shown by the fact that each took at least one civil service police entrance examination. Hence they were not prejudiced even if there were the claimed discrimination.

█ Nor is there merit to the point that the named plaintiffs should be allowed to raise on behalf of those blacks and Spanish-surnamed persons who did not know of the police entrance examinations the issue of an alleged failure to furnish information to black and Spanish-surnamed persons on the same basis as other white persons. With respect to this issue the uninformed are not in the same class as the named plaintiffs. This is not a case in which defendants are alleged or proved to have had a purpose or plan to discriminate against a class, or ethnic group, and to have used one tactic against one member and another tactic against another. Here what is involved are separate types of practices. Each type is claimed to be irrelevant to its ostensible object and to have a discriminatory effect, but the separate practices are not linked by a common intent or scheme. Therefore, a person who suffers from the effect of one practice has no right to complain of the effect of another practice. Thus a black plaintiff who failed a police entrance examination has no standing to complain that a Puerto Rican less than 5′ 7″ tall cannot become a Boston policeman, or that someone was not informed of the examination the plaintiff failed.

█ A more important answer to plaintiffs' first specific grievance is that

it just is not true that defendants failed to apprise black and Spanish-surnamed persons of the police entrance examinations. The Commission posted in its own offices, and caused city and town clerks to post in their offices, and the Boston police department to post in police stations notices of forthcoming police entrance examinations. Those formal, public written notices were adequate and non-discriminatory. They were not at all comparable to such word-of-mouth notices as were involved in United States v. Local 86 International Association of Bridge Structural, Ornamental and Reinforcing Ironworkers, 315 F.Supp. 1202, 1235 (N.D.Wash., 1970), aff'd 443 F.2d 544 (9th Cir., 1971); United States v. Sheet Metal Workers Local 36, 416 F.2d 123 (8th Cir., 1969).

■ Plaintiffs also contend that defendants failed to exercise sufficient efforts to recruit black and Spanish-surnamed persons. Such a contention is not set forth in the complaint either specifically or in apt general language. In any event, it is not a claim that may validly be made under the 1871 Civil Rights Act, 42 U.S.C. §§ 1981 and 1983, or under the equal protection clause of the Fourteenth Amendment. Neither that statute nor that amendment, *ex proprio vigore*, imposes upon a state or city official a *legal* duty to take affirmative measures directed not to the community at large but specifically to minority groups to recruit persons for employment, even if the official believes that such groups have previously been subjected to discrimination. This is not to deny that, after finding that an official in his employment practices had discriminated against a minority, a court as part of the remedy may order the official to take special measures to encourage members of that minority to apply for employment. See Carter v. Gallagher, *supra*. All that is now said is that by itself neither the 1871 Act nor the equal pro-

tection clause commands a state official to take affirmative steps to correct a past discrimination. Any other interpretation would impose legal liability on every state official who has not on his own initiative taken an activist role to overturn the consequences of centuries of administrative discrimination against all types of minorities.

The plaintiffs' second specific grievance, which plaintiff Darby who has not a high school diploma or equivalent certificate has standing to raise, is that the members and the Director of the Civil Service Commission established educational requirements which do not bear upon any legitimate job qualifications. What plaintiffs attack is the requirement first embodied in Mass.St.1969 c. 484, and now incorporated in Mass.G.L. c. 31 § 6A, that applicants for appointment as regular police officers "have graduated from high school or possess an equivalency certificate [7] issued by the department of education or have served at least three years in the armed forces of the United States."

■ In answer to that attack, first, the high school diploma requirement was not established by the Civil Service Commission, and so does not come within the literal scope of plaintiffs' pleading.

■ Second, if this be construed as a suit to restrain the enforcement of a state statute upon the ground of its unconstitutionality by restraining state officers in enforcing it, then a three-judge court would be required unless the constitutional question is insubstantial. 28 U.S.C. § 2281. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). Here the constitutional question with respect to the requirement of a high school diploma or its equivalent is insubstantial because the requirement is obviously significantly related to job performance as a policeman. A high school education or its equivalent plays

---

7. The equivalency certificate is given to one who has passed five tests in English covering (1) spelling, punctuation, and grammar, (2) social studies, (3) natural sciences, (4) comprehension of selections of prose and poetry, and (5) general mathematics.

an important role in fitting a policeman to perform such duties as understanding and applying complicated legal regulations, preparing official reports, testifying, presenting matters to courts and administrative agencies, and explaining to laymen their legal obligations. Policemen, unlike the firemen involved in Carter v. Gallagher, *supra,* and unlike some other types of employees, (see Note, 84 Harv.L.Rev. 1109, 1141–1143), are in a calling in which book knowledge is an important element and there is a constant demand for the performance of intellectual as well as physical tasks. The Massachusetts requirement of a high school diploma or its equivalent was adopted in the light of a "meaningful study" of the requirement's "relationship to job-performance ability." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Two years before the Massachusetts statute was enacted the President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime In A Free Society (1967) p. 110 recommended that every police department should "insist immediately that all recruits, except community service officers, have both a high school diploma and a demonstrated ability measured by appropriate tests, to do college work." See the same Commission's Task Force Report, The Police (1967) p. 126. See also National Advisory Commission on Civil Disorders, pp. IV, 6, 7.

Under those circumstances it is quite irrelevant that a validation study showing that the possession of a high school diploma is predictive of good work as a policeman was not made before or since the requirement was adopted, or that a large percentage of present-day Massachusetts or Boston policemen do not have high school diplomas, or that the percentage of blacks who have high school diplomas is far lower than the percentage of whites who have that educational badge.

If a job requirement has in fact a significant relation to successful or improved job performance and is adopted

*bona fide* by an employer exclusively on that account, and not as a mere device intended covertly or openly to discriminate against some racial or like minority group, the Constitutional guarantee of equal protection is met. Under such circumstances it is not of Constitutional significance that (a) the requirement was not before its adoption validated as predictive of job success; or (b) the requirement operates so as to have more disadvantageous consequences for some groups than for others, or (c) a substitute requirement would be equally predictive of success and would not involve discriminatory consequences. See 84 Harv.L.Rev. 1109, 1130 first paragraph.

Another specific grievance which plaintiffs seek to raise concerns the height requirement for policemen. When this action began the MDC police and the Capitol Police administratively imposed a 5′ 8″ requirement, and Mass.G.L. c. 31 § 5B provided that "No rule regulating the height and weight of persons eligible to become members of * * * police forces of a city or town shall be made or enforced except by the city council or selectmen, provided that no such rule made by a city council or selectmen may allow a minimum height for applicants in such a police force lower than five feet seven inches." This statute was amended June 3, 1971 by St.1971, c. 370 to provide:

> "No rule regulating the height and weight of persons eligible to become members of fire and police forces of a city or town shall be made or enforced except by the city council or selectmen, provided that no such rule made by a city council or selectmen may require a minimum height for applicants in such a police force greater than five feet seven inches, nor require a lesser minimum height without the approval of the director."

At all material times Boston has had a 5′ 7″ height requirement.

It does not appear that any of plaintiffs has a standing to challenge

the height requirement. The only one of plaintiffs who claims to have been affected by the height requirement is Garcia who is less than 5′ 7″ tall. He did apply to the Civil Service Commission to be certified as eligible to be a Boston policeman; but he has never passed a police entrance examination. Therefore, he *cannot validly claim* that what bars him from becoming a policeman is the height requirement. Because his objection is premature he lacks standing.

If we do assume that anyone has standing to challenge the height requirement, it is important to recognize that it is a local city or town requirement. Neither Mass.G.L. c. 31 § 5B nor St.1971, c. 370 purports to authorize such a requirement but rather limits pre-existing local powers. What is attacked is the action of the Boston City Council and possibly other local governments. None of them is a party to this case. If defendant Commissioner McNamara is being sued because he is enforcing a Council regulation, the complaint fails so to allege; and moreover, it does not appear from the evidence he is in fact enforcing the regulation against any plaintiff.

 But if we assume that the issue of the constitutionality of the regulation is properly before the court it is not unconstitutional. It is probable that while height is not *determinative* of fitness to be a policeman, any more than it is of fitness to be an athlete or a general, it is *significantly related* to fitness to be a policeman, as it is not significantly related to being a judge or a scientist. A policeman of average height or taller may not be more effective than a short one in persuading children, drunks, rioters, and obstreperous persons to obey promptly, he may not be physically stronger, and he may not even look more impressive in a police parade. But obviously the Boston City Council thought so, and its conclusion finds support in the laws, regulations, and customs governing many police forces. A Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1907), type of brief could be compiled to sustain the reasonableness of the regulation.

While there is a difference between finding that a regulation is reasonable and therefore should not be invalidated under the due process clause and finding that it is significantly related to appropriate requirements for a job and therefore should not be invalidated under the equal protection clause, it is a difference which (even though motive is not the test under the equal protection clause) a court should not be quick to stress in a situation where there is not the slightest suspicion that the regulation had a discriminatory or other invidious purpose and where the discriminatory consequences did not emerge until long after it was adopted. Here no one suggests that the height regulation was intended to discriminate or does discriminate against blacks since on the average they are not shorter than whites. If the regulation adversely affects Spanish-surnamed persons because they are said to be on the average shorter than the generality of whites it is clear that they were not the object of the Boston height regulation which antedated the mass immigration to this Commonwealth from the Caribbean.

For all the foregoing reasons this court concludes that plaintiffs are not entitled to prevail on so much of their complaint as involves the height requirement.

Another of plaintiffs' grievances which, as non-swimmers, plaintiffs Franklin and Green have standing to raise, relates to the mandatory 100-yard swim test.

Since 1968 applicants for police forces other than the MBTA police and the Capitol Police have been required to pass a 100-yard swim test.

Ability to swim at least 100 yards has a demonstrable relation to general fitness, to physical courage, and to effectiveness in certain types of emergency rescue. It may reasonably be inferred that anyone who has learned to swim 100 yards has at least a rudimentary capacity to save persons from some water perils. Moreover, some swimming ability by policemen is reasonably expected by the public. It takes no remarkable pow-

ers of imagination to foresee the justified outcry there would be if a child drowned in a lake while a policeman stood by without making even an effort at a rescue and gave as his excuse that he could not swim.

Hence a 100-yard swim test has a significant relation to job performance by policemen even if in the particular community where the job is to be performed there is little water, there have been no known incidents in which a policeman was called upon to swim, and there is no assurance that a policeman who knows how to swim has also mastered the art of life-saving.

The mandatory swim requirement, being neutral in intent and on its face and having a significant relation to job performance, does not violate the equal protection clause even though it was not before or after its adoption validated as predictive of successful job performance, and even though it disqualifies members of some minority groups at a substantially higher rate than it does the generality of people.

Plaintiffs' principal grievance, which every one of the eight named plaintiffs has standing to raise because each one failed one or more of the police entrance examinations, is that members and the Director of the Civil Service Commission "required police applicants to submit to a written examination which had not been validated as predictive of successful job performance in the position of policeman, and which has the effect of excluding a disproportionate number of black and Spanish-Surnamed applicants." See Complaint V, 10, (b).

On this central grievance these are the basic facts.

The Director of Civil Service places upon lists of eligible police candidates and certifies to police authorities, such as the Commissioner of Police of the City of Boston, only those who have scored 70 or better in a written competitive examination prepared only in English.

In the period here relevant the director set at roughly six month intervals competitive examinations for all applicants for permanent patrolman positions in all police forces in the Commonwealth.

For many years before 1967 the written test part of the competitive examination consisted of fifty questions based on a police manual or bluebook prepared by the Division of Civil Service, fifteen questions intended to measure memory, and ten questions intended to measure general information. The two written tests given in the year 1967 each consisted of sixty questions based on the bluebook and forty questions intended to measure general information. In 1968 the Director changed the written test to a so-called "general intelligence" type of test. That type of test is the one here challenged. The change to the general intelligence type of test was made at the request of officials of the Boston Police Department and other police authorities. One reason was to increase the number of applicants by eliminating the need to study the bluebook. Another reason was that the police authorities had found that applicants who memorized the bluebook were not necessarily able to apply it.

The intelligence tests here challenged were initially prepared by Oliver Hunt Bowman, Supervising Civil Service Examiner, but were subject to change by his superiors, Bernard Sexton (Assistant to the Director of Civil Service and in charge of the Bureau of Examination), Assistant Director of Civil Service Mc-Rell, and Director of Civil Service Campbell. None of these persons had any academic or other training with respect to test design or police selection. What they relied upon was their general experience in civil service administration, their familiarity with examinations given for other types of civil service employment, information about patrolmen's duties supplied to them by the requisitioning appointing officers, acquaintance with some examinations given in other states for policemen, and reading of general literature.

Bowman, with the approval of his superiors, determined that there should be

in the written test 100 multiple-choice questions, and that a passing grade should be 70.

The grade 70 was arbitrarily selected without relation to the difficulty of the examination, or the number of persons who took the examination, or the number who were expected to get a grade of 70 or better.

These 100 muliple-choice questions fell in six categories: word knowledge, numerical sequence, reading comprehension, reasoning, arithmetic, and analogy. There was no formula governing how many questions were to be in each category; and the proportions in the different categories varied in different examinations.

No attempt was made to relate the questions to an occupational analysis of a policeman's job, or to the successful performance of that job, or to training programs for that job. Some of the questions were original; others were drawn from intelligence tests given for purposes different than examining police candidates. Thus intelligence tests were given without advance validation of any kind.

Nor are these examinations capable of subsequent rational validation on the ground that they relate to a candidate's qualifications for a policeman's position. Their emphasis is on academic and verbal skills having little relation to a policeman's job. Not only do they not purport to test knowledge of the specific areas of a policeman's work, but they do not have apt questions to test the intellectual, personality, or character traits relevant to a policeman's job. There is almost no effort to test the particular types of observation, memory, statement, and judgment which are useful in connection with the exercise of authority of all kinds, and which are necessary for policemen as guardians, administrators, witnesses, community counsellors, social welfare aids, and representatives of a regime of law and order.

The categories of questions sound as though they had been drawn from *Alice In Wonderland*. On their face the questions seem no better suited to testing ability to perform a policeman's job than would be crossword puzzles.

Nor has there been any attempt to prove by empirical [8] validation that, although on their face these questions seem not to be rationally related to a policeman's job and thus predictive of the ability of persons successfully to be policemen or at least successfully to be trained as policemen, the facts are that these tests do test such ability.

It is shown in connection with the only police entrance examination in which it was possible to learn the color, race, and similar characteristics of those being examined, that is the September 26, 1970 examination that there was a marked discrepancy between the success of black and Spanish-surnamed candidates and the success of the generality of whites. Only 25% of the 80 black candidates and only 10% of the Spanish-surnamed candidates passed; but about 65% of the others passed.

██ On the basis of the foregoing facts this court concludes that the general intelligence type of police entrance examinations given in 1968, 1969 and 1970 by the Civil Service Commission were not rationally or empirically significantly related to the capacity of applicants to be trained for or to perform a policeman's job.[9]

8. There are two main categories of validation "rational" and "empirical." See Note, Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1121–1123 (1971).

9. It is possible that intelligence tests may be predictive of ability to be trained for, but not of ability ultimately to perform, a policeman's job. See Note 84 Harv.L.Rev. 1109, 1126. It is also possible that, no matter how well devised, intelligence tests and even aptitude tests are not highly reliable indicators of performance ability as a policeman. *Ibid*, pp. 1120–1121. One might hazard a guess that reliable aptitude tests cannot be designed for candidates for the Presidency, Congress, the Supreme Court and many

Moreover, this court concludes that those examinations were discriminatory against minorities which did not share the prevailing white culture: that is, against groups such as blacks, yellows, browns, American Indians, persons reared in lands where the preferred language is not English, and even whites from backwood areas. Moreover, discriminatory consequences of intelligence examinations of this verbal, academic, multiple-choice type were foreseeable by sophisticated persons. See Note 84 Harv.L.Rev. 1109, 1123; Richard Herrnstein, I. Q., The Atlantic Monthly, vol. 228, pp. 43–64, September 1971. Furthermore, in open court the civil service defendants have admitted that they now recognize that the examinations are discriminatory against minorities, although they were not aware of that flaw when they gave the examinations.

Inasmuch as the civil service examinations were not job related and were discriminatory against the plaintiffs, any state or city official, who innocently or otherwise, used the results of those examinations to deprive a plaintiff of a job opportunity deprived him of the equal protection of the laws guaranteed by the Fourteenth Amendment and violated 42 U.S.C. §§ 1981 and 1983. Carter v. Gallagher, *supra.*

The principle just stated [10] obviously imposes liability upon defendant Campbell since she as Director of Civil Service, pursuant to Mass.G.L. c. 31 § 10, determined the form of the examinations and conducted them, and prepared eligibility lists and certificates based on the results of the examinations. The principle also imposes liability upon the five defendant members of the Civil Service Commission whose subordinates were implicated in preparing the examinations.

However, defendant McNamara, the Police Commissioner of the City of Boston, stands in a position different from the other defendants. Part V paragraph 10 of the complaint does not charge him with, and the evidence shows he did not have, any part in conducting the police entrance examinations, or designing their texts, or using their results to prepare eligibility lists and certificates. All he did was to use the civil service certificates to make appointments. It is not alleged or shown that he acted in a discriminatory fashion in selecting candidates from those certified to him. He acted after the discrimination had been effected; he did not approve of it, add to it, or cause it to be more effective. The damage was already done beyond repair by the Commissioner of Police. And there is no evidence that he has any intent further to use outstanding certificates or other fruit of the poisonous tree.

As the complaint alleged, it was the Civil Service Commission and Director who deprived plaintiffs of the equal protection of the law by setting improper examinations and using their results to make improper certificates. They alone

lesser public and private offices. The reasons include the relative unimportance of intellectual dexterity in achieving success and the greater significance of integrity, strength of character, attractive personality, emotional stability, wisdom, judgment, sympathy, social imagination, intuition, common sense and good fortune. In achieving success as a policeman some of these factors may be more determinative than capacity to pass examinations. After all, lawyers know that capacity to pass legal aptitude tests is more predictive of ability as a law student than ability as a trial lawyer, a corporate office lawyer, and perhaps as any other type of lawyer or judge. It would not be astonishing to learn that the most that intelligence or aptitude tests can be counted upon to accomplish is to winnow out the obviously incompetent police candidates. No doubt, among the reasons that intelligence tests, particularly of the multiple-choice type, continue to be so popular is not only that they appear to be objective, *Ibid*, p. 1120, but it is so easy to grade them quickly.

10. We need not consider whether Mass. G.L. c. 31 § 10 also imposes upon defendant Campbell a liability to plaintiffs, because even if it does plaintiffs' right to relief against her would not be increased.

are liable under 42 U.S.C. §§ 1981 and 1983 or any other statutory or constitutional provision. Defendant McNamara is entitled to have the complaint against him dismissed.

So far as concerns relief, what the defendants have in common is that first, they are entitled to declarations that (1) none of them had an intent, motive, plan or like purposeful policy to discriminate against any of the named plaintiffs or those on whose behalf plaintiffs sued, (2) defendants did not fail to apprise plaintiffs of police employment opportunities while making such information available to white persons, (3) defendants did not establish educational requirements which did not bear upon legitimate job qualifications for policemen, and (4) aside from the Civil Service defendants' requirements that applicants for police positions submit to intelligence tests, defendants did not require police applicants to submit to any improper job requirement.

Plaintiffs are entitled to affirmative declarations that (1) the intelligence tests which in the years 1968, 1969, and 1970 formed part of the police entrance examinations conducted by defendant Campbell with the cooperation of subordinates of the five defendants who are members of the Massachusetts Civil Service Commission failed to comply with Mass.G.L. c. 31 § 10, were not significantly related to determining capacity to perform a policeman's job, and gave a discriminatory advantage to white persons whose original primary language was English, and who had been trained and educated in the mainstream of American society, and (2) the Civil Service defendants' use of the results of those examinations to establish lists of persons eligible for police appointments and to prepare certificates to police authorities, deprived plaintiffs of the equal protection of the laws guaranteed by the Fourteenth Amendment and created liability under 42 U.S.C. §§ 1981 and 1983.

With respect to defendant Campbell plaintiffs are, in the first place, entitled to injunctions restraining her and her successors and associates from (1) issuing any further certificates based upon the results of the 1968–1970 police entrance examinations and (2) conducting any police entrance examination which is not significantly related to a policeman's job or which discriminates against any racial, national, cultural, or other comparable group. The double-barrelled aspect of the second restraint is deliberate. In earlier parts of this opinion this court has ruled that, whatever may be the situation with respect to certain statutory and administrative obligations, (see Note 84 Harv.L.Rev. 1109, 1130), the equal protection clause of the Fourteenth Amendment to the United States Constitution *ex proprio vigore* does not make a racially discriminatory job requirement unlawful in cases where the requirements is significantly related to a job. But this court recognizes that some wholly relevant tests may, and others may not, have a racially discriminatory effect. In view of the history of police examinations in Massachusetts and their effect in minimizing the proportion of employees from minority groups, it seems important to the court not to permit hereafter the use of any discriminatory testing requirements that are easily avoided. This court recognizes that this restraint may lead the Civil Service Commission to abandon all types of general intelligence tests and to focus on tests which place greater stress on aptitudes specifically related to a policeman's job.

This court is not willing to require, as plaintiffs urge on the basis of the precedent of Carter v. Gallagher, *supra*, that the Civil Service Commission before giving a police examination shall submit it to plaintiffs' counsel and the court. These are the reasons for not following *Carter*: the errors of the Civil Service Director and Commission were committed without a bad motive; they volunteered in open court an admission of their mistake; there would be substantial delays if every examination had to be inspected by counsel and

subjected to the risk of judicial hearing before it could be given; and there would be grave risks that the text of examinations could not be kept confidential.

On the other hand, it seems appropriate for this court to give some guidelines as to how an examination might be prepared so as to give parties reasonable grounds for supposing it would pass muster if it were claimed not to comply with this court's decree. With that object in mind, this court's decree will provide that a police entrance examination shall be deemed *prima facie* significantly related to a policeman's job and non-discriminatory if—

a. Before the examination was prepared, the Director of Civil Service procured from the appropriate appointing authorities, or from a representative selection of them, a detailed job analysis fully describing the policeman's job.

b. The Director of Civil Service caused the examination to be designed by an expert who had not less than five years' experience in designing comparable examinations or who had a doctoral or like academic degree particularly related to expertness in this type of testing.

c. Before the examination was given, the person who designed it and another equally expert person named by the Director of Civil Service but not employed by the Civil Service Commission each filed with the Director of Civil Service his independent certificate stating his reasons for concluding that the examination was significantly related to the policeman's job and non-discriminatory.

d. Within a week after the examination was given, the Director of Civil Service opened to public inspection the aforesaid certificates.

This court will be prepared to consider suggestions as to other ways in which an examination may be prepared so as to create a *prima facie* presumption of its validity. For example, it may be that an examination should be regarded as *prima facie* valid if the questions have been subjected to rational validation by a specifically designated society, institution, university, or recognized expert, or if the questions have been empirically tested by being given to presently employed policemen in advance of or simultaneously with the public examination.

This court declines to follow plaintiffs' proposals for preferential hiring of these plaintiffs or other black and Spanish-surnamed persons. Quite apart from such constitutional problems as would be presented (see Carter v. Gallagher, *supra* and Note 84 Harv.L. Rev. 1109, 1115), this court sees no reason to put blacks, for example, ahead of Indians, or Chinese, or whites who are in a comparable plight.

With admirable good sense, plaintiffs do not ask that those who have already been appointed as a result of passing an improper examination shall be dismissed. But plaintiffs do contend that those who are merely on eligibility lists as a result of prior improper tests shall not retain that undeserved advantage unconstitutionally accomplished. This contention is sound, and will indeed be accomplished by this court's restraint, heretofore discussed, prohibiting defendant Campbell from using existing eligibility lists. In order that those on the eligibility lists who will no longer enjoy their ill-gotten advantage may have a status to contest on appeal this or any other provision of this court's judgment, this court will allow any of them to intervene in this case at any time within two weeks of the filing of this opinion.

There remains the difficult problem as to what steps this court should direct defendants to take to publicize the examinations and, more important, to recruit policemen hereafter so that all minority groups will know that their members are not only welcome but eagerly sought as policemen.

Other provisions of the decree will require that within one month after the appeal time from this judgment expires

without an appeal, or, if an appeal is taken, one month after the appellate court's mandate reaches this court, the Civil Service Commission shall submit a comprehensive plan for recruiting members of minority groups for all police forces to which appointment is covered by civil service law. Included shall be samples of proposed public statements, proposed methods of advertising in the media of press, radio, and television, proposed methods of reaching minority organizations, and proposed methods of reporting to this court periodically the success achieved both in recruitment and appointment.

This court will entertain proposals for financial or other assistance that the Department of Justice or any other federal or state agency offers to help effectuate the provisions or purposes of the decree, will permit those who are aggrieved by failure of any party to comply with the decree to petition to intervene, and will retain jurisdiction of the case.

Judgment in accordance with the opinion.

## JUDGMENT

Upon the basis of the evidence, the arguments of counsel, and the opinion of this court dated November 17, 1971 it is ordered, adjudged and decreed that:

1. None of the defendants had any intent, motive, plan, or like purposeful policy to discriminate against any plaintiff.

2. Defendants did not fail to apprise plaintiffs of police employment opportunities while making such information available to white persons.

3. Defendants did not establish educational requirements which did not bear upon legitimate job qualifications for policemen.

4. Aside from the requirements of the Civil Service Commission and the Director of Civil Service that applicants for police positions submit to intelligence tests, defendants did not require police applicants to submit to any improper job requirement.

5. The intelligence tests which formed part of the police entrance examinations conducted by the Director of Civil Service and the Massachusetts Civil Service Commission in 1968, 1969, and 1970 failed to comply with Mass.G.L. c. 31 § 10, were not significantly related to determining capacity to perform a policeman's job, and gave a discriminatory advantage to white persons whose original primary language was English, and who had been trained and educated in the mainstream of American society.

6. The use by the Director of Civil Service and the Massachusetts Civil Service Commission of the results of the 1968–1970 police entrance examinations to establish lists of persons eligible for police appointments and to prepare certificates to police authorities deprived plaintiffs of the equal protection of the laws guaranteed by the Fourteenth Amendment and created liability under 42 U.S.C. §§ 1981 and 1983.

7. The complaint against defendant McNamara is dismissed without costs.

8. Defendant Campbell as Director of the Massachusetts Civil Service, her associates, and successors and the defendant members of the Massachusetts Civil Service Commission and their successors are permanently restrained from (a) issuing any further certificates based upon the results of the 1968–1970 police entrance examinations and (b) conducting any police entrance examination which is not significantly related to a policeman's job or which discriminates against any racial, national, cultural, or other comparable group. A police entrance examination shall be deemed *prima facie* significantly related to a policeman's job and non-discriminatory if—

a. Before the examination was prepared, the Director of Civil Service procured from the appropriate appointing authorities, or from a representative selection of them, a detailed job analysis fully describing the policeman's job.

b. The Director of Civil Service caused the examination to be designed by an expert who had not less than five years' experience in designing comparable examinations or who had a doctoral or like academic degree particularly related to expertness in this type of testing.

c. Before the examination was given, the person who designed it and another equally expert person named by the Director of Civil Service but not employed by the Civil Service Commission each filed with the Director of Civil Service his independent certificate stating his reasons for concluding that the examination was significantly related to the policeman's job and non-discriminatory.

d. Within a week after the examination was given, the Director of Civil Service opened to public inspection the aforesaid certificates.

Alternatively, a police entrance examination shall be deemed *prima facie* significantly related to a policeman's job if it has been rationally or empirically validated in a manner approved by the court.

9. The defendant Campbell and her successors as Director of Civil Service and the defendant members of the Civil Service Commission and their successors shall limit participation in the next police entrance examination to persons who took police entrance examinations in 1968, 1969 or 1970. Such persons shall be eligible whether they passed or failed and regardless of color, race, nationality, or other factors. The aforesaid defendants shall give to each such person known to them, unless he is known to them not to be interested, a written notice as promptly as possible of his eligibility to take such an examination and of the place and time where it will be given. The notice shall state that it is given pursuant to this court's judgment in order to redress discrimination unintentionally effected by previous examinations; that the examination will be validated in a manner complying with paragraph 8 of this judgment; and that

eligibility lists and certificates prepared in the year following the examination so far as practicable will be prepared exclusively from the list of the persons who take such examination unless otherwise ordered by this court. Defendant Campbell shall submit to the court a plan for giving comparable public notices by poster, news release, and advertisement.

10. Within one month after the appeal time from this judgment expires without an appeal, or, if an appeal is taken, one month after the appellate court's mandate reaches this court, the Massachusetts Civil Service Commission shall submit a comprehensive plan for recruiting minority groups for all police forces covered by civil service law. Included shall be samples of proposed public statements, proposed methods of advertising in the media of press, radio, and television, proposed methods of reaching minority organizations, and proposed methods of reporting to the court periodically the success achieved in both recruitment and appointment.

11. Any person who is aggrieved by this decree or by the failure of any person to comply with this decree may petition this court for intervention.

12. This court retains jurisdiction of this case.

## SUPPLEMENTAL MEMORANDUM

There are some miscellaneous matters which deserve further attention than the court was able to give in its November 17, 1971 opinion, which was prepared and filed to meet an emergency situation presented to the court by defendant McNamara who foresaw the need of immediate appointments to the Boston police force.

I

First, a further word should be said in support of this court's earlier action in denying the motion made by the eight named plaintiffs to be allowed to represent a class of those blacks and Spanish-surnamed persons who have applied, or might have applied, or might hereafter apply to be policemen.

This is not a case in which it is alleged, much less proved, that defendants had an intent, motive, or plan to discriminate against black and Spanish-surnamed persons. What is involved are allegations that the consequences of certain types of practices were discriminatory against blacks and Spanish-surnamed persons. However, it has been apparent from the beginning of this litigation that these adverse consequences flowed from the fact that the plaintiffs were not what may be called mainstream whites. The effects of which plaintiffs complained were shared by all who were not white persons born in English speaking areas, not only by black and Spanish-surnamed persons.

Of course, there is no obligation on plaintiffs to offer to represent all non-mainstream whites. But the question is whether in a case where the complaint as its principal relief seeks an injunction ordering defendants to inaugurate "a system under which qualified applicants will be hired from the class of plaintiffs as openings arise" the court should allow plaintiffs to pick and choose among the non-mainstream whites those for whom it will seek relief.

The only reasons why plaintiffs want to represent the class of black and Spanish-surnamed persons is so that all of them may get priority in being hired, and possibly so that they may have a special status to complain if defendants hereafter discriminate. If black and Spanish-surnamed persons are entitled to any kind of priority, or if they have a right to be re-examined in a special examination, yellows and browns are entitled to the same priority and right. The attempt, intentional or otherwise, of the blacks and Spanish-surnamed to get ahead of some other minority victims of defendants' practices cannot justly be allowed to succeed.

Moreover, the class which the eight plaintiffs have sought to represent is based upon the wholly fallacious assumption that here we are dealing, as in cases like United States v. Jefferson County Bd. of Educ., 372 F.2d 836 (5th Cir., 1966), corrected, 380 F.2d 385 (5th Cir., 1967), cert. denied, 389 U.S. 840 (1967); Parham v. Southwestern Bell Tel. Co., 433 F.2d 421 (8th Cir., 1970); and Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir., 1969), with defendants who had an intent to discriminate against a particular race and used different tactics to accomplish that purpose. Here the proposed class includes victims of different types of tactics which are wholly unrelated except that they all produce consequences which are felt by black and Spanish-surnamed persons. If defendants discriminated against blacks by the examinations they gave, by swimming requirements, by recruitment methods, and by other practices, the questions of law or fact common to black victims of the different practices do not predominate over questions affecting only victims of the particular practice. Thus one of the requirements laid down by F.R.Civ.P. Rule 23(b) (3) for a proper class suit has not been fulfilled.

## II

Plaintiffs and amici curiae seem to approach this case by inquiring first whether defendants followed practices discriminatory against blacks, and, if so, whether those practices were significantly related to job performance, and, even if they were, whether alternative practices would not be equally effective from the viewpoint of the police departments as employers. Some support for this approach is to be found under quite different circumstances in cases such as Chance v. Board of Examiners, 330 F. Supp. 203 (S.D.N.Y., 1971) and Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir., 1971).

But that approach is inappropriate here. It reflects the unspoken premise that in our society each minority, regardless of its technical capacities, has a constitutional right to a quota of policemen corresponding to the minority's percentage in the population. It may very well be true that such a quota system would have political advantages and that law

and order would best be promoted by police who represented a cross-section of the community. However, it is a fallacy to suppose that the Constitution entitles blacks to police selected like jurors as representatives of a cross-section of the community. Blacks have no more a constitutional right to a quota of black policemen than a quota of black judges or legislators or state-employed teachers. What blacks and other minorities have a right to is that public employees like policemen shall be selected by criteria that are significantly related to a job. If employees are so selected in good faith, it is from a constitutional angle wholly irrelevant that the result is that blacks get a percentage less than their percentage of the population. It is not constitutionally objectionable if under a selection system based on significantly relevant criteria, chosen and adhered to in good faith, and administered fairly, 70% of those appointed are, let us say, of Irish ancestry, and only 3% are black.

What is perhaps a closer question is what the Constitution—not some statute or regulation—would require if in the situation just described it could be shown that some other equally relevant criteria would produce a police force with only 50% of Irish ancestry and 15% blacks. Absence of relevant evidence as to how many blacks are *qualified* to be policemen makes this a question which we need not decide in the present case. Perhaps it is not even a case which would arise in practice because if there were such alternate relevant criteria which would produce a police force with 15% wholly qualified blacks, it could, subject to rebuttal, be presumed that the authorities were not in good faith when they adhered to the criteria which resulted in only 3% of the police force being black.

### III

A third topic on which a further word may appropriately be said is the failure of the court's judgment to give to black and Spanish-surnamed persons priority so that the percentages of those groups may correspond to their percentages in the population.

One point, already made, is that the Constitution does not establish a quota system. Another is that even if blacks, let us say, are entitled as soon as possible to have in the police force a percentage corresponding to the percentage of *qualified* people in the community who are black, (on the plausible ground that the blacks would have had that percentage if there had been no discrimination) we have no accurate index to show what would have been that percentage. We are sure that because of their centuries of disadvantage, the percentage of blacks qualified to be policemen is lower than the percentage of blacks in the population. Moreover, we have reason to suppose that because of their attitude toward police forces, the percentage of qualified blacks who want to be police is lower than let us say the percentage of qualified persons of Irish ancestry who want to be police.

Nor should the experience of cities like Atlanta, Baltimore, and Chicago lead us to conclude that if there had been no discrimination the percentage of Boston policemen who were black would correspond with the percentage of Boston residents who were black. In those three cities it was not a case of there having been no discrimination and of "other things being equal." There the authorities actively recruited black persons and in a real sense discriminated in favor of blacks for undoubtedly good reasons, related to the authorities' best judgment of what the situation politically required, using "politically" in an Aristotelian, not a partisan, sense.

Here it may be that the qualified blacks under a neutral system would have reached a substantial percentage of the Boston police force, but it is a mere guess—and the evidence with respect to the turnout at the September 1970 examination after defendant McNamara's diligent recruitment efforts, makes any specific figure suspect. Only 5% of those who showed up at that examination

were black, and there is no reason to suppose that under a job-related examination the result would have been that of those who passed 5% would have been black.

The foregoing analysis shows that, on the inadequate evidence in this record as to the percentage of qualified blacks and Spanish-surnamed persons wanting appointment as policemen, a conscientious court mindful of strictly legal considerations cannot *command* defendants to follow plaintiffs' priority proposals which resemble those approved, on wholly different records (and with respect to jobs involving qualifications less rigorous than those of policemen), in Local 53, Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir., 1969); United States v. Local 86, Ironworkers, 443 F.2d 544 (9th Cir., 1971), aff'g 315 F.Supp. 1202 (W.D.Wash., 1970); United States v. Local 53, Asbestos Workers, 62 [CCH] Lab. Cas. par. 9411 (E.D.La., 1970); Strain v. Philpott, 331 F.Supp. 836 (E.D.Ala. M.D., 1971); United States v. Frazer, 63 [CCH] Lab.Cas. par. 9502 (M.D.Ala., 1870); United States v. Central Motor Lines, 325 F.Supp. 478 (W.D.N.C., 1970); and United States v. Local 10, Sheet Metal Workers, 3 [CCH] EPD par. 8068 (D.N.J., 1970).

Nothing said herein suggests that the police appointing authorities are not legally free to follow the precedents of Baltimore, Chicago, Detroit and other communities in seeking to use intensive recruitment methods to induce many qualified persons from all groups to take civil service examinations. Nor has this court indicated that, in view of the special needs of this community, there might not be among the significantly relevant criteria for police appointments in this Commonwealth a showing of knowledge of the special problems of at least one minority group, so that, for example, to be appointed a Boston policeman each candidate whether white, black, yellow, Spanish-speaking, or French-speaking would have to pass an examination as to how to handle the problems of at least one minority, of which he would not necessarily be a member.

## MEMORANDUM AND ORDER ON MOTION TO MODIFY JUDGMENT

Responding to the motion to modify judgment filed December 2, 1971 by counsel for all plaintiffs and for all defendants this court strikes paragraph 9 of its judgment and strikes from its opinion the following passages:

*Page 21 lines 3 to 9*—these words—

"Any person, no matter what his color or name, who after January 1, 1968, when intelligence tests were first used, took a civil service police entrance examination and either did not pass or passed and was not appointed is entitled to be re-examined. Even if he passed an earlier examination, he may have received a lower grade than he would have in a proper test. Nor is it unfair to limit to old applicants the first examination given after this case is decided. After all, they have a right to have their diligence rewarded, and the injury done to them repaired at least in part."

*Page 21, 3 lines from the bottom through page 22, line 6*—these words—

"One provision of the decree will require the Civil Service Commission to notify each person who took a police entrance examination in the years 1968, 1969 and 1970, and who is not known to the Commission to be no longer interested because he has a police job or otherwise, that he is eligible to take a special examination at a particular time in the immediate future. The notice must summarize the reasons for the special examination including a statement that one of its objects is to redress past discriminatory practices."

The effect of the aforesaid deletions in the judgment and opinion is with respect to the next civil service examination for policemen the Civil Service defendants will be subject only to the general conditions already stipulated in paragraph 8 of the judgment. They will not be required to limit participation in the next police examination to persons who took police entrance examinations in 1968, 1969, or 1970.

The court declines to modify its judgment to enable the Civil Service defendants to treat as valid eligible lists based upon earlier examinations. The reason is that in this court's opinion such examinations were constitutionally defective because they were not reasonably related or significantly relevant to a policeman's job and gave a discriminatory advantage to mainstream whites.

This may be an appropriate place for the court to amplify the reasons that led it to deny the full priority sought by plaintiffs in their original prayers for relief. What plaintiffs wanted was a judgment ordering the police departments to hire black and Spanish-surnamed persons on a basis of one out of every two appointments for some period of time, perhaps until those minorities had a percentage of the police force corresponding to their percentage of the population. Such a priority might have been proper if all minorities were as qualified as the majority for the policeman's position and the differential in actual employment were due to intentional discrimination. But here there was no intent to discriminate; probably the black and Spanish-surnamed persons were not as a whole as qualified as mainstream whites; probably the black and Spanish-surnamed persons did not apply in proportion to their numbers in the community; and the only wrong which was proved to this court's satisfaction was limited to the consequences of examinations given in 3 years. This court did not find that any other examinations were unreasonable, irrelevant, or discriminatory. Nor did this court find that the discriminatory examinations given in 1968, 1969, and 1970 had any "chilling" effect on anyone except those who failed them. Nor has this court evidence upon which it can find how many black and Spanish-surnamed persons in those 3 years applied for civil service examinations or how many of them had qualifications which would have enabled them to pass significantly relevant examinations. Under these circumstances the court believes that the remedy best supported by the record is for this court to direct the Civil Service Commission to wash the slate clean and to leave it free to give examinations to all who care to compete.

Paragraph 9 of the judgment is struck.

Petition to intervene granted as to groups 1 and 3 as shown in pars. 1–4 and 6.

Intervenor's complaint denied.

Petition to intervene denied as to group 2 on ground it is moot.

### ORDER

1. The judgment of November 17, 1971 is amended by deleting paragraph 9 thereof.

2. The petition for intervention filed by Hodges and others December 1, 1971 is granted with respect to the group of which Hodges is a member and who are on a list certified by the Massachusetts Civil Service Commission, and with respect to the group of which Scott is a member and who also are on a list certified by the Massachusetts Civil Service Commission. The petition is denied with respect to the group of which DeVoe is a member on the ground the point they seek to raise is moot.

3. The intervenors' complaint is denied on its merits.

4. All other outstanding motions are denied.

### JUDGMENT

Upon the basis of the evidence, the arguments of counsel, and the opinion of this court dated November 17, 1971 it is ordered, adjudged and decreed that:

1. None of the defendants had any intent, motive, plan, or like purposeful policy to discriminate against any plaintiff.

2. Defendants did not fail to apprise plaintiffs of police employment opportunities while making such information available to white persons.

3. Defendants did not establish education requirements which did not bear upon legitimate job qualifications for policemen.

4. Aside from the requirements of the Civil Service Commission and the Director of Civil Service that applicants for police positions submit to intelligence tests, defendants did not require police applicants to submit to any improper job requirement.

5. The intelligence tests which formed part of the police entrance examinations conducted by the Director of Civil Service and the Massachusetts Civil Service Commission in 1968, 1969, and 1970 failed to comply with Mass.G.L. c. 31 § 10, were not significantly related to determining capacity to perform a policeman's job, and gave a discriminatory advantage to white persons whose original primary language was English, and who had been trained and educated in the mainstream of American society.

6. The use by the Director of Civil Service and the Massachusetts Civil Service Commission of the results of the 1968–1970 police entrance examinations to establish lists of persons eligible for police appointments and to prepare certificates to police authorities deprived plaintiffs of the equal protection of the laws guaranteed by the Fourteenth Amendment and created liability under 42 U.S.C. §§ 1981 and 1983.

7. The complaint against defendant McNamara is dismissed without costs.

8. Defendant Campbell as Director of the Massachusetts Civil Service, her associates, and successors and the defendant members of the Massachusetts Civil Service Commission and their successors are permanently restrained from (a) issuing any further certificates based upon the results of the 1968–1970 police entrance examinations and (b) conducting any police entrance examination which is not significantly related to a policeman's job or which discriminates against any racial, national, cultural, or other comparable group. A police entrance examination shall be deemed *prima facie* significantly related to a policeman's job and nondiscriminatory if—

a. Before the examination was prepared, the Director of Civil Service procured from the appropriate appointing authorities, or from a representative selection of them, a detailed job analysis fully describing the policeman's job.

b. The Director of Civil Service caused the examination to be designed by an expert who had not less than five years' experience in designing comparable examinations or who had a doctoral or like academic degree particularly related to expertness in this type of testing.

c. Before the examination was given, the person who designed it and another equally expert person named by the Director of Civil Service but not employed by the Civil Service Commission each filed with the Director of Civil Service his independent certificate stating his reasons for concluding that the examination was significantly related to the policeman's job and non-discriminatory.

d. Within a week after the examination was given, the Director of Civil Service opened to public inspection the aforesaid certificates.

Alternatively, a police entrance examination shall be deemed *prima facie* significantly related to a policeman's job if it has been rationally or empirically validated in a manner approved by the court.

9. Within one month after the appeal time from this judgment expires without an appeal, or, if an appeal is taken, one month after the appellate court's mandate reaches this court, the Massachusetts Civil Service Commission shall submit a comprehensive plan for recruiting minority groups for all police forces covered by civil service law. Included shall be samples of proposed public statements, proposed methods of advertising in the media of press, radio, and television, proposed methods of reaching minority organizations, and proposed methods of reporting to the court periodically the success achieved in both recruitment and appointment.

10. Any person who is aggrieved by this decree or by the failure of any per-

son to comply with this decree may petition this court for intervention.

11. This court retains jurisdiction of this case.