v.

William BOLGER, et al., Defendants.

No. C-76-1979 RFP.

United States District Court,
N.D. California.

Dec. 2, 1987.

Harvey Sohnen, Page & Sohnen, Walnut Creek, David R. Lipson, Rubin, Eagan & Feder, San Francisco, for plaintiffs.

Joann M. Swanson, Asst. U.S. Atty., San Francisco, for defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR ORDER ENFORCING SETTLEMENT DECREE

PECKHAM, Chief Judge.

### INTRODUCTION

Following this court's approval of a consent decree on March 7, 1983, the United States Postal Service ("Postal Service") implemented a two-tier salary schedule for the jobs at issue in this dispute. Under that schedule, new persons hired into career positions after a cut-off date would receive lower starting salaries than those hired before the cut-off date. This motion is brought by plaintiff Incorporated Mexican–American Government Employees ("I.M.A.G.E.") and seven individual Hispanic class members,[1] who assert that the Postal Service delayed hiring until just after the cut-off date, allegedly in violation of the decree. Plaintiffs seek a court order requiring the Postal Service to compensate these seven class members, as well as all those similarly situated, in accordance with the salary structure in effect immediately before the cut-off date. Plaintiffs also seek back pay.

### BACKGROUND

This dispute was originally filed as a class action by these plaintiffs in 1976. The claim, asserted under Title VII of the 1964 Civil Rights Act, as amended by the Equal Opportunity Employment Act of 1972, 42 U.S.C. § 2000e–16, alleged discrimination by the Postal Service against Hispanic persons. By 1982, the action was narrowed to focus on employment practices with respect to four entry level positions at Bay Area postal facilities: mailhandler, manual distribution clerk, carrier and distribution clerk-machine.

Prior to 1981, the Postal Service used three computerized, multiple-choice exams for hiring applicants. Certain qualifying veterans were given preference points in addition to the points received on the exam. All examinees receiving passing grades were placed on a list, with certain veteran

---

1. The plaintiffs subsequently added seven additional individual class members to this action.

preference categories first, and with applicants ranked according to their exam scores within each category of exam. These "hiring lists" were used to select, in order of rank, applicants for pre-employment processing, which involved physical examinations and the like. As a practical matter, potential employees who appeared and passed the physical and other screening were hired in rank order.

Beginning in 1980, the Postal Service began compiling ethnic data in connection with hiring. Based upon evidence of adverse impact of tests on Hispanic applicants, this court entered a preliminary injunction with respect to one of the tests. *I.M.A.G.E. v. Bailar*, 518 F.Supp. 800 (N.D. Cal.1981). Soon afterward, the parties stipulated to an extension of this injunction to all three tests. The injunction was designed to alleviate the adverse impact of the ranking system by requiring the Postal Service to exhaust the hiring lists before administering any further tests. Thus, the preliminary injunction enjoined the Postal Service practice of conducting new tests before exhausting prior lists and thereby avoiding making offers to those with lower passing scores.

In 1982, shortly before the case was scheduled for trial, the parties reached a settlement in principle, resulting in a proposed consent decree. After a fairness hearing, the court approved the consent decree on March 7, 1983. Pursuant to the decree, the Postal Service implemented procedures which provided Hispanic class members with a preference in the hiring process. The new procedures operated as a preference principally because, with the exception of certain veterans, the applicant pool was limited to Hispanic class members and was no longer open to the general public. This mechanism remained in place from March, 1983 until the hiring process was reopened to the general public on February 19, 1985. During this interval, virtually all employment testing was directed at class members and a limited group of veterans.

The decree provided the Postal Service with seven years to meet the overall hiring objective for the decree, together with several, alternative annual goals. The decree set forth a minimum hiring rate of 14.7% Hispanics for the positions in question until a 9.8% Hispanic workforce composition was achieved. From May 1983 through October 1985, the majority of those hired off the hiring registers were class members. Despite class-member complaints of slow processing, the Postal Service exceeded the minimum workforce objective of 9.8% before October, 1984. By October, 1986, Hispanics represented 23.3% of the total workforce.

At the time the decree was entered, each position in question was covered by a civil service pay schedule which included initial salary, periodic salary increases and periodic cost of living adjustments. These schedules were collectively bargained by the union corresponding to each job category. The consent decree did not address the starting salaries of class members to be offered positions after they reapplied for employment pursuant to the decree.

The collective bargaining agreements pertaining to these job categories all expired in July, 1984. The Postal Service and the unions were unable to reach new agreements. The dispute was submitted to arbitration, and, on December 24, 1984, the arbitration panel accepted the Postal Service's demand that a two-tier system be implemented for all job categories other than mailhandlers, with an effective date of January 18, 1985. On January 7, 1985, the arbitration panel approved a similar two-tiered system for mailhandlers. Under these two-tiered systems, those hired after the effective date received substantially lower starting salaries than those hired before the effective date. For example, the mailhandler arbitration resulted in an 18% pay differential between tiers. The lowest pay differential was 13% for letter carriers. Workers hired under the new tier's pay scale would not receive the same salary as equally experienced workers under the old tier until they had been on the job for ten or more years.

On December 24, 1984, Mary J. Layton, Assistant Postmaster General, Public and Communications Department, sent out an internal electronic message to all post offices stating that the arbitral award instituting the two-tier wage scale had been

announced. The message instructed all post offices to freeze hiring until January 19, 1985, when the lower wage scale would take effect. This directive was later clarified to permit the hiring of casuals only.

At the time, it was unclear whether employees who were in the process of being hired or whose hiring dates were intentionally deferred during the period of December 24 to January 18 fell within the old or new pay schedule. Each of the unions representing the positions in question filed grievances in Spring 1985 alleging that all employees hired during this period should receive salaries under the old pay scale. The unions and Postal Service settled their grievances in early 1986, determining that only those who received firm offers of employment prior to January 7, 1985 would be entitled to the old pay scale.[2]

The seven class members making the present motion were hired as mailhandlers from the register issued on December 19, 1984. The notice sent to each described the job as paying a wage under the old tier ($10.46 per hour). Each was told to appear for processing on January 7, 1985. On that day, a postal official told the applicants that hiring would be delayed until after January 18 due to "contract negotiations", with the effect that the employees would receive a salary under the new tier, less than the wage set forth in the call-in notice. Medical exams and the like took place shortly thereafter. Of those who appeared for processing on January 7, some were given start dates of January 19 and were subsequently reclassified into the higher tier.[3] Others were told to start work on

February 2 at the lower starting wage of $8.60 per hour; they were not reclassified and remain in the lower tier. Each of the seven class members herein fall into this latter group.

The plaintiffs now move for an order to enforce the consent decree. Specifically, plaintiffs contend that the Postal Service breached the consent decree by deliberately delaying the hiring of class members until after the cut-off date. They seek a determination of class-wide liability and ask that the court appoint a special master to hear individual claims.

## DISCUSSION

In order to establish a *prima facie* case of discrimination under Title VII, plaintiffs must show that they belong to a protected group and that they received treatment different from other similarly situated persons who are not members of their class. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If the plaintiffs are able to establish a *prima facie* case of discrimination, the burden shifts to the defendant to show a "legitimate, nondiscriminatory reason" for the differing treatment. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

Here, all parties agree that the individual plaintiffs are members of the protected class. The plaintiffs are unable to satisfy the second prong of the *prima facie* case, however; indeed, the plaintiffs admit that they received precisely the same treatment

---

**2.** There is some disagreement between the parties as to the outcome of the grievance proceedings. The plaintiffs claim that those whose starting dates were initially on or before January 18, 1985, only to be later cancelled and rescheduled beyond the January 18 cut-off, were placed back in the higher tier as the result of the grievance settlement. In contrast, those whose appointments were delayed but who had not received a specific starting date on or before January 18 received no relief. The Postal Service characterizes the terms of the grievance settlement somewhat differently, stating that only those who received firm offers of employment prior to January 7, 1985 obtained relief. Both sides agree that the seven class members here did not qualify for, nor did they receive,

relief as a consequence of the grievance proceedings.

There is also some dispute as to the basis for the resolution of these grievances. It is unclear whether the result achieved was the product of a settlement between the unions and the Postal Service, or simply the result of a determination that the unions lacked jurisdiction to grieve on behalf of those who had not received firm job offers at the time the Postal Service committed the disputed acts.

Neither of these factual disputes bear on the outcome reached by the court.

**3.** Apparently these reclassifications were made in error. Sohnen Declaration at 4.

as other applicants during this period. Thus, plaintiffs are unable to show that they were singled out for differing treatment in any meaningful sense.

The plaintiffs respond that their legal rights do not arise under Title VII, but under the consent decree itself. The question before the court thus turns upon proper construction of the consent decree. The Supreme Court faced a similar problem in *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). In *Firefighters*, the district court enjoined operation of the defendant city's "last-hired first-fired" layoff policy because such layoffs would undermine the minority hiring goals set forth in a consent decree earlier approved by the court. The Supreme Court reversed the Sixth Circuit's affirmance of this ruling, stating:

> It is to be recalled that the "scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it" or by what "might have been written had the plaintiff established his factual claims and theories in litigation."

467 U.S. at 574, 104 S.Ct. at 2585 (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)). In concluding that the consent decree did not contain an implied term overturning the seniority system as applied to blacks, the court noted that the decree nowhere mentioned layoffs or demotions, nor was there any suggestion that the decree marked a departure from the existing seniority system. The Court further reasoned that bona fide seniority systems are protected under Title VII; thus, it would be anomolous to interpret a consent decree to provide relief not available under the statute. *Id.* 467 U.S. at 575, 104 S.Ct. at 2586. Finally, the Court noted that neither the

Firefighters' Union nor the nonminority employees were party to the negotiations leading to the consent decree, concluding, "[a]bsent the presence of the Union or the nonminority employees and an opportunity for them to agree or disagree with any provisions of the decree that might encroach on their rights, it seems highly unlikely that the City would purport to bargain away nonminority rights under the then-existing seniority system." *Id.*[4]

Although the consent decree in the instant case makes no express mention of wages, Paragraph VII provides, "[i]t is the purpose of this Decree to insure that Hispanics are not disadvantaged in the hiring policies and practices of the Postal Service." Nothing in this provision precludes the Postal Service action taken here, however. Quite simply, the implementation of the two-tier system did not operate to the disadvantage of class members. Rather, it affected all new employees, without regard to race.

The plaintiffs respond that the consent decree includes an implied promise by the Postal Service to process promptly the applications of those class members seeking employment. In dragging its feet throughout the reapplication process, they argue, the Postal Service has breached that promise. They further contend that the Postal Service impliedly agreed not to manipulate the hiring process to take advantage of fluctuations in the wage scale. The plaintiffs characterize the consent decree as essentially a contract enforceable by court order; as such, the decree contains an implied covenant of good faith and fair dealing. Under such a view, the Postal Service's alleged foot-dragging has deprived Hispanic class members of the benefit of their "bargain": employment at comparable salary levels.

The plaintiffs claim that the Postal Service breached these implied terms in the

**4.** The plaintiffs argue that subsequent courts have distinguished *Firefighters*, effectively limiting its applicability to the facts of that case. The holding in *Firefighters* turned on two independent arguments, however: the proper construction of the consent decree itself, and the scope of the district court's authority to modify the decree. The cases cited by plaintiffs purportedly limiting the applicability of *Firefighters* focus on the second argument. As such, they are inapposite. The issue here is proper construction of the consent decree, an inquiry which necessarily turns on the facts of each case. *Firefighters* is helpful in that it shows how the Supreme Court approached a similar construction problem in connection with a different decree.

following manner: first, it drew out and delayed the testing process, although such delay may have been inadvertent; and second, it deliberately froze hiring pursuant to the internal telegram of December 24 in order to hire new workers at the lower wage scale. The plaintiffs concede that these delaying tactics may not have been racially motivated, and that the consequences of these tactics fell equally on all those seeking employment with the Postal Service, Hispanic or not. However, the plaintiffs argue that, unlike non-class members, Hispanics alone possessed implied contractual rights created by the consent decree, rights that the Postal Service violated.

Contrary to the plaintiffs protestations, the Postal Service has not breached any terms in the consent decree, implied or otherwise. The plaintiffs argue that the Postal Service procrastinated in processing employment applications, thereby breaching its implied duty to process applications in a reasonable amount of time. Clearly the Postal Service was under some duty to implement the decree in a timely fashion.[5] However, in view of the fact that hiring targets set forth in the decree were vastly exceeded, the court concludes that the Postal Service met any such duty.

The plaintiffs' attack on the hiring freeze from December 24 to January 18 is also misplaced. As noted above, the decree makes no mention of wage levels. The decree sought to restore proportionate hiring levels; it did not purport to secure a minimum salary. The plaintiffs argue that the intentional delay in hiring deprived them of the benefit of their bargain.

Whether this is so depends on how one characterizes that benefit. The plaintiffs urge the court to characterize this benefit as employment at comparable wages. It might more accurately be characterized, however, as employment at collectively bargained wages, and this is precisely what the plaintiffs received.[6]

Because the court finds that the plaintiffs have not set forth a *prima facie* case under Title VII and the Postal Service has thus far complied with the express and implied terms of the consent decree, the plaintiffs motion to compel enforcement of the decree is denied.

IT IS SO ORDERED.

---

5. By its terms, the decree provides the Postal Service with seven years to meet its hiring goals. Arguably, the Postal Service was obliged to take reasonable steps to implement the decree as soon as practicable; thus, the seven year target date merely provided a *maximum allowable* date for compliance.

6. The plaintiffs argue that *Firefighters* is distinguishable because here the two-tier wage scale was not implemented until *after* the decree had been entered. In the instant case, the parties to the decree could not have anticipated a decline in wages. Indeed, plaintiffs urge, it is reasonable to conclude that the parties contemplated comparable or higher wages under future collective bargaining agreements, as regular wage increases had been the norm.

However, the plaintiffs' original action did include an allegation of wage discrimination. The plaintiffs later omitted this claim, narrowing the decree to focus on hiring procedures only. Although the plaintiffs' preferred interpretation of the silence on wages is certainly plausible, it is more reasonable to conclude that the plaintiffs simply chose to cast their lot with the collective bargaining process with respect to wages.